**Salem**

WILLIAM EUGENE SANFORD

v.

BETTY PHILLIPS SANFORD

Nos. 1717-93-3 and 1718-93-3

and

BETTY PHILLIPS SANFORD

v.

WILLIAM EUGENE SANFORD

No. 1750-93-3

Decided November 15, 1994

Counsel

Sidney H. Kirstein, for William Eugene Sanford.

Robert C. Wood, III (Edmunds & Williams, on briefs), for Betty Phillips Sanford.

Opinion

**COLEMAN, J.**—In this domestic relations appeal we decide whether the trial court erred (1) by granting William Sanford credit against future spousal support obligations for support payments he made in excess of the court-ordered monthly support, (2) by refusing to award attorney's fees to Betty Sanford, and (3) by ordering Mr. Sanford to provide his former wife with copies of his future tax returns. Both parties appeal the trial court's rulings.

We hold that because William Sanford was required to pay spousal support in accordance with the terms of the support decree, he was not entitled to credit the amount he paid in excess of his court-ordered monthly support against his future support obligations. Accordingly, because William Sanford was not entitled to credit, he is in arrears in his spousal support. Because the Sanfords' property settlement agreement required that he pay his wife's attorney's fees if she had to enforce a default in the support obligation, which agreement the court had approved and incorporated into the final divorce decree, William Sanford is required to pay Betty Sanford's attorney's fees. Finally, in regard to the trial court's ordering the parties to exchange future income tax returns, we hold that because providing the tax returns is not relevant to any pending issue, the trial court erred by requiring the parties, for informational purposes only, to exchange their returns, which may contain confidential and personal information.

Thus, we reverse the trial court's decision to grant William Sanford credit against his future support obligations and find William Sanford to be in arrears in spousal support through March, 1993, in the amount of $24,300. We remand the case for the trial court to enter judgment for the support arrearage and to determine a reasonable attorney's fee to be paid Betty Sanford.

## I. CREDIT FOR OVERPAYMENTS

### A. Facts

William and Betty Sanford entered into a property settlement agreement in January, 1991, in which William Sanford agreed to pay spousal support to Betty Sanford in the amount of $8,000 per month. The trial court ratified, confirmed, approved, and incorporated the agreement into the final divorce decree.

In October, 1991, Mr. Sanford was terminated by his employer, Olan Mills. As part of the termination, Olan Mills agreed to pay him one year severance pay through September, 1992. Based upon this change in Mr. Sanford's employment, the Sanfords agreed to reduce his monthly support obligation to $5,600 per month, which sum was to be paid directly to Betty Sanford by Olan Mills through September, 1992. The court entered a decree approving and incorporating the amended property settlement agreement as the court-ordered spousal support.

In January, 1992, after the amended spousal support order was entered, Mr. Sanford obtained a consulting job paying him a one time annual income of $120,000. When Mr. Sanford began receiving the additional income from the consulting job, he told his former wife that he would send her an additional $3,100 each month from January, 1992, until September, 1992. He told her that he intended to treat these additional monthly payments as advance payments against his future monthly spousal support obligations. He also requested of Betty Sanford that, in consideration of the additional monthly support, she agree to reduce his monthly support obligation to $3,100 per month after September, 1992. Betty Sanford did not agree to credit the additional $3,100 payments in monthly support against Mr. Sanford's future spousal support obligations, nor did she agree to reduce the amount of support payments after September, 1992.

Mr. Sanford began sending his former wife a $3,100 check each month from January, 1992, through December, 1992. On each check, he wrote that the check was for spousal support or "alimony" for the respective month in which the check was written. Betty Sanford accepted and cashed the checks for the additional $3,100 per month as they were paid. During that time, neither party petitioned the court to modify the spousal support obligation based on the $120,000 increase in Mr. Sanford's annual income.

After September, 1992, when Mr. Sanford's severance pay ended, Olan Mills stopped paying Betty Sanford $5,600 per month. Mr. Sanford continued to pay Betty Sanford $3,100 per month through December, 1992. During that time, the court's decree requiring Mr. Sanford to pay $5,600 per month spousal support remained in effect. In January, 1993, Mr. Sanford stopped sending Betty Sanford any spousal support payments.

Betty Sanford filed a petition to show cause, alleging that Mr. Sanford was in arrears on his support obligation from September, 1992, through December, 1992, during which time he paid $3,100 rather than $5,600, and from January, 1993, through March, 1993, during which time he paid nothing. Thus, she claimed support arrearages in the amount of $24,300. Mr. Sanford claimed that between January, 1992, through September, 1992, he paid $3,100 per month in excess of his court-ordered support obligation; therefore, he was entitled to have the $27,900 excess payments credited against his deficiencies between September, 1992, and March, 1993. The trial court found that Betty Sanford had not agreed that the additional support payments would be credited against future support. The court found, however, that William Sanford was entitled to credits against his future support obligations for the excess support payments over and above the ordered $5,600 because, by accepting the payments, Betty Sanford had ratified such an agreement. Thus, the trial court found that Mr. Sanford was not in arrears and dismissed Betty Sanford's petition.

Mr. Sanford then filed a petition to reduce his monthly spousal support obligation. The court granted the petition and reduced his support obligation from $5,600 to $4,200 per month.

## B. Analysis

[I]t is the obligation of the divorced husband to pay the specified amounts according to the terms of the decree and . . . he should not be permitted to vary these terms to suit his convenience. . . . [When circumstances change, to] warrant a change in the terms of the decree . . . [the husband's] remedy is to apply to the court for such relief. To permit him to increase the amount of the specified payments at one time, reduce them at another, and require an adjustment of the differences in the future, would lead to continuous trouble and turmoil. . . . To allow the husband credit for these overpayments would be to deprive the [recipient] of the future benefit of the amount of support money which the lower court has found was proper and has ordered to be paid.

*Newton v. Newton*, 202 Va. 515, 519, 118 S.E.2d 656, 659 (1961). Although the *Newton* case involves a child support decree, the "rule applies to awards of spousal support or to unitary awards for spousal support and independent child support," *Taylor v. Taylor*, 14 Va. App. 642, 646, 418 S.E.2d 900, 902 (1992), and that rule controls our decision here. *See also Richardson v. Moore*, 217 Va. 422, 423-24, 229 S.E.2d 864, 866 (1976) (holding that the rule applies to spousal support and unitary support awards). Our Supreme Court repeatedly has demanded strict compliance with the express terms of divorce decrees as they relate to the payment of spousal and child support.

Moreover,

even a court of equity, in an effort to do equity, cannot disregard the provisions of a lawful decree, nor is such a court justified in offsetting against payments required to be made under such a decree voluntary payments. . . . If a party to such a decree is not satisfied with its provisions relative to . . . payments required to be made for . . . support, such party may always come into court and ask for a modification of the decree.

*Fearon v. Fearon*, 207 Va. 927, 931, 154 S.E.2d 165, 168 (1967) (unitary award of spousal and child support). A spouse ordered to pay support "must pay 'according to the terms of the decree . . .'" [and] payments [made in excess of the amount ordered are] gifts

or gratuities and cannot be credited to his obligation to pay the support award." *Johnson v. Johnson*, 1 Va. App. 330, 333, 338 S.E.2d 353, 355 (1986) (citations omitted) (unitary award of "alimony" and child support).

Although the Sanford's divorce decree ordered Mr. Sanford to pay $5,600 per month in spousal support, from October, 1992, through December, 1992, he paid only $3,100 per month support, and from January, 1993, through March, 1993, he paid nothing. Mr. Sanford argues, nevertheless, he is entitled to credit against the deficiencies between September, 1992, and March, 1993, because the parties had a "good faith" understanding that the additional support payments he made of $3,100 per month between January, 1992, and September, 1992, totalling $27,900, were for future support. Therefore, according to Mr. Sanford, Betty Sanford is estopped by virtue of their oral agreement to deny him credit for these payments. In support of his argument, he relies upon the cases of *Gagliano v. Gagliano*, 215 Va. 447, 211 S.E.2d 62 (1975), and *Acree v. Acree*, 2 Va. App. 151, 342 S.E.2d 68 (1986).

We find the holdings in *Gagliano* and *Acree* to be inapposite to this case. *Gagliano* does not apply because there the Court held that the wife was estopped from enforcing a *pendente lite* support decree because she and her husband had entered into and fully performed a written property settlement agreement in which she relinquished her right to spousal support. Mrs. Gagliano, by written contract, had relinquished her right to spousal support. Here, Betty Sanford did not enter into a contract or agree to relinquish any support rights she had under the support decree.

Likewise, *Acree* does not apply because there the father and mother had an "unequivocal agreement" for a "*permanent* change of [child] custody where[by] the obligated spouse assumed total responsibility for the support of the child." We held in *Acree* that the "purpose of the support decree ha[d] been fulfilled" when the custodial parent relinquished custody "on a *permanent* basis and has further agreed to the elimination of support payments and *such agreement has been fully performed.*" *Id.* at 157, 342 S.E.2d at 71. No similar agreement existed between the Sanfords. Betty Sanford's needs for support between September, 1992, and March, 1993, had not been shown to have changed and the court's decree ordering $5,600 per month in support continued in

effect between September, 1992, and March, 1993, during which time Mr. Sanford failed to comply with the terms of the support order.

Betty Sanford did not agree to release Mr. Sanford of his obligation to pay spousal support. She did not agree to grant him credit for the $3,100 in monthly payments he made between January, 1992, and December, 1992, and the trial court so found. Significantly, these excess monthly support payments were during a time that Mr. Sanford was receiving additional annual income of $120,000 over and above that amount on which the last support agreement had been predicated. Although the trial court indicated that, based on the fact that Betty Sanford accepted and deposited the additional checks in her account, she ratified an agreement to give Mr. Sanford credit, that holding was error. "If the wife's active contractual consent does not excuse a husband's noncompliance with a court's alimony decree, a wife's passive acquiescence does not, and we so hold." *Richardson v. Moore*, 217 Va. at 423, 229 S.E.2d at 866. *See also Alig v. Alig*, 220 Va. 80, 255 S.E.2d 494 (1979). But moreover, because Mr. Sanford designated on the $3,100 checks that they were for support in the month paid, no factual basis exists to support the trial court's conclusion that Betty Sanford ratified an agreement to accept the checks for future support.

The Sanfords had no written agreement that the payments were to be considered future spousal support. Mr. Sanford designated on his checks that they were for spousal support for the months in which the payments were made. The fact that Mr. Sanford made monthly spousal support payments in excess of the court-ordered amount after he began receiving an additional $120,000 in annual income indicates that the payments were additional spousal support based on Mr. Sanford's substantially increased income. In effect, Mr. Sanford was paying additional spousal support based on an increase in income, even though neither party sought to have the support decree modified to reflect this change in circumstance. Support payments made by an obligated spouse over and above court-ordered monthly support are considered gifts or gratuities. *See Fearon*, 207 Va. at 931, 154 S.E.2d at 168; *Newton*, 202 Va. at 519, 118 S.E.2d at 659.

It was incumbent upon Mr. Sanford or Betty Sanford to petition the court to modify the support obligation under the de-

cree. Neither party can unilaterally vary its terms. Mr. Sanford cannot "increase the amount of the specified payments at one time, reduce them at another, and require an adjustment of the difference in the future." *Newton*, 202 Va. at 519, 118 S.E.2d at 659.

Accordingly, we hold that the trial court erred in giving Mr. Sanford credit for $27,900 in support payments made between January and September, 1992, against his support obligation for October, 1992, through March, 1993, in the absence of an express agreement between the parties. Accordingly, Mr. Sanford is in arrears on his spousal support obligation through March, 1993, in the amount of $24,300.

## II. ATTORNEY'S FEES

The Sanfords' separation agreement, which was incorporated into the divorce decree, provides that (1) each party will pay his or her own attorney's fees in connection with the divorce, (2) a defaulting party will indemnify the other for reasonable attorney's fees incurred in successfully enforcing the terms of the separation agreement, and (3) a party who has failed to disclose all assets will be responsible for attorney's fees incurred in litigation concerning those assets.

After the hearings in February and March, 1993, dealing with the petitions for the arrearage and to modify the support obligation, the trial court awarded Betty Sanford one-half of her attorney's fees incurred in both proceedings. The trial court also directed that the parties exchange their future tax returns.

■ Code § 20-109 bars a trial court from "directing the payment of . . . suit money or counsel fee[s] . . . except in accordance with th[e] [parties'] . . . contract." The Sanfords' separation agreement expressly provided for an award of attorney's fees to a party who incurs expenses and costs to enforce a default.[1] Because Mr. Sanford defaulted in making his spousal support payments after September, 1992, and because Betty Sanford incurred legal expenses and costs to determine and enforce the support arrearage, he is required under the terms of the agreement and decree

---

[1] Paragraph 25 in the parties' separation agreement provides, "the defaulting party will indemnify the other for all reasonable expenses and costs, including reasonable attorney's fees incurred in successfully enforcing the terms of this agreement."

to pay his former wife's legal fees. Furthermore, because Betty Sanford has prevailed on appeal, under the same terms of the agreement and decree, Mr. Sanford is obligated to pay her attorney's fees expended on appeal to enforce the spousal support obligation.

We remand the case to the trial court for a determination and award of attorney's fees due Betty Sanford for the enforcement proceeding, including an amount for that part of the appeal devoted to the enforcement.

## III. TAX RETURNS

■ Finally, in regard to the trial court's order that the parties exchange copies of their future income tax returns, Mr. Sanford contends that Code § 20-109 prohibits such an order because the statute bars the trial court from "imposing any . . . condition . . . except in accordance with . . . [the parties'] contract."

■ Assuredly, the parties' property settlement agreement does not obligate the parties to exchange income tax returns. However, nothing in the agreement precludes the trial court from requiring either party to provide the other with a copy of his or her income tax returns. The agreement is silent in this regard. Code § 20-109 only restricts the action a trial court may take where the parties have agreed upon a matter. Code § 20-109 does not prohibit a trial court from ordering a course of action upon a matter that the parties do not address in their property settlement agreement, provided the court is not otherwise precluded from doing so and the course of action is appropriate.

■ When divorcing spouses are obligated to pay or entitled to receive spousal support based upon their respective incomes and needs, the production of the spouses' income tax returns, including the schedules that tend to prove the person's income or needs, are relevant and admissible. Trial courts regularly require divorcing spouses to produce tax returns in order to prove a party's income and expenses. The information contained in the party's tax return and related schedules is relevant to the issues of the parties' abilities to support themselves or to contribute to the support of the other. Rule 4:1(b)(1) allows for discovery of any matter that is relevant to pending litigation, and tax returns are generally relevant to litigation where spousal support is at issue. *See Johnson*,

1 Va. App. at 332, 338 S.E.2d at 355.

■ Where, however, no petition is pending to determine support or to modify a support award, no basis exists to justify the court ordering the parties to exchange their federal income tax returns. The fact that the production or exchange of such information *in futuro* might appear desirable because it will enable a former spouse to monitor when material changes in circumstance as to income have occurred, the information is not presently relevant or material to any issue being litigated. Furthermore, the fact that a spousal support award is in place, requiring the payment of ongoing periodic support, does not make evidence of a party's future income relevant or material where no issue is being litigated.

■ Thus, we join other courts that have held that because a party's income tax return contains confidential and personal information, inspection or disclosure of it should only be permitted for good cause, *see Lepis v. Lepis*, 83 N.J. 139, 416 A.2d 45 (1980), and even when good cause has been shown, on motion of the producing party any information in the return or schedules not relevant to the issues being litigated should be redacted. *See Weingarten v. Weingarten*, 234 N.J. Super. 318, 560 A.2d 1243 (1989). *See also Cersosimo v. Cersosimo*, 188 Conn. 385, 449 A.2d 1026 (1982); *Fassihi v. St. Mary Hospital*, 121 Mich. App. 11, 328 N.W.2d 132 (1982). Because no proceeding was pending for which the exchange of the parties' tax returns was relevant, the trial court abused its discretion by ordering the parties to exchange their returns.

## IV. CONCLUSION

Accordingly, we reverse the trial court's decisions granting Mr. Sanford credit against his spousal support obligation and requiring an exchange of income tax returns. We remand the case for the trial court to determine and enter judgment in favor of Betty Sanford for the support arrearage and to determine the amount of attorney's fees due Betty Sanford.

*Reversed and remanded.*

Koontz, J., and Elder, J., concurred.